In The

# United States Court of Appeals
## For The Federal Circuit

## NEGAR HESSAMI,

*Petitioner,*

v.

## MERIT SYSTEMS PROTECTION BOARD,

*Respondent.*

## PETITION FOR REVIEW OF THE MERIT SYSTEMS PROTECTION BOARD IN NO. PH-1221-17-0271-W-2

## BRIEF OF PETITIONER

Kellee Boulais Kruse
R. Scott Oswald
THE EMPLOYMENT LAW GROUP, P.C.
888 17th Street, NW, Suite 900
Washington, DC 20006
(202) 261-2838
kkruse@employmentlawgroup.com
soswald@employmentlawgroup.com

*Counsel for Petitioner*

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Negar Hessami v. Merit Systems Protection Board

Case No. 19-2291

**CERTIFICATE OF INTEREST**

Counsel for the:

☐ (petitioner) ☒ (appellant) ☐ (respondent) ☐ (appellee) ☐ (amicus) ☐ (name of party)

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10% or more of stock in the party |
| --- | --- | --- |
| Negar Hessami | none | none |
| none | | |
| none | | |
| none | | |
| none | | |
| none | | |
| none | | |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court **(and who have not or will not enter an appearance in this case)** are:

The Employment Law Group, P.C.
R. Scott Oswald
Counsel for Appellant

5.    The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47. 4(a)(5) and 47.5(b).  (The parties should attach continuation pages as necessary).

None

9/3/2019

Date

Please Note: All questions must be answered

R. Scott Oswald

Printed name of counsel

Signature of counsel

cc:    All counsel served via ECF

Reset Fields

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT OF RELATED CASES ....................................................... vi

STATEMENT OF JURISDICTION .............................................................. 1

STATEMENT OF ISSUES ........................................................................... 1

STATEMENT OF THE CASE ....................................................................... 2

PROCEDURAL HISTORY ........................................................................... 9

SUMMARY OF THE ARGUMENT ............................................................ 9

STANDARD OF REVIEW .......................................................................... 11

ARGUMENT ................................................................................................ 12

    I.    Hessami's disclosures amount to far more than participation in
        a robust discussion on policy ............................................................ 13

    II.    Hessami has presented ample evidence that she had a
        reasonable belief that her disclosures were protected under the
        WPEA .................................................................................................. 16

        a.    Violations of law, Rule, and Regulation .................................. 17

        b.    Gross Waste of Funds ............................................................... 18

        c.    Gross Mismanagement .............................................................. 18

        d.    Abuse of Authority .................................................................... 20

        e.    Danger to Public Health and Safety ......................................... 21

CONCLUSION ............................................................................................ 22

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bennett v. Merit Sys. Prot. Bd.*,
635 F.3d 1215 (Fed. Cir. 2011) ......................................................................11

*Bolton v. Merit Sys. Prot. Bd.*,
154 F.3d 1313 (Fed. Cir. 1998) ......................................................................11

*Brewer v. United States Postal Serv.*,
227 Ct. Cl. 276, 647 F.2d 1093 (1981) ...........................................................12

*Chambers v. Dep't of Interior*,
515 F.3d 1362 (Fed. Cir. 2008) ..........................................................15, 21, 22

*Chambers v. Dep't of Interior*,
602 F.3d 1370 (Fed. Cir. 2010) ................................................................21, 22

*Dumas v. Merit Sys. Prot. Bd.*,
789 F.2d 892 (Fed. Cir. 1986) .......................................................................13

*Hansen v. Merit Sys. Prot. Bd.*,
746 F. App'x 976 (Fed. Cir. 2018) ................................................................20

*Harris v. Dep't of Veterans Affairs*,
142 F.3d 1463 (Fed. Cir. 1998) ......................................................................11

*Herman v. Dep't of Justice*,
193 F.3d 1375 (Fed. Cir. 1999) ......................................................................17

*Hogan v. Dep't of the Navy*,
218 F.3d 1361 (Fed. Cir. 2000) ................................................................. 11-12

*Johnston v. Merit Sys. Prot. Bd.*,
518 F.3d 905 (Fed. Cir. 2008) ..................................................................11, 12

*Lachance v. White,*
174 F.3d 1378 (Fed. Cir. 1999) ........................................................17, 20

*Langer v. Dep't of Treasury,*
265 F.3d 1259 (Fed. Cir. 2001) ..............................................................17

*Manning v. Merit Sys. Prot. Bd.,*
742 F.2d 1424 (Fed. Cir. 1984) ..............................................................13

*Marano v. Dep't of Justice,*
2 F.3d 1137 (Fed. Cir. 1993) ..................................................................12

*O'Donnell v. Merit Sys. Prot. Bd.,*
561 F. App'x 926 (Fed. Cir. 2014) ....................................................14, 15

*Ormond v. Dep't of Justice,*
118 M.S.P.R. 337 (2012)..........................................................................15

*Ramos v. Dep't of the Treasury,*
72 M.S.P.R. 235 (1996)............................................................................20

*Reid v. Merit Sys. Prot. Bd.,*
508 F.3d 674 (Fed. Cir. 2007) .................................................................16

*Standley v. Merit Sys. Prot. Bd.,*
715 F. App'x 998 (Fed. Cir. 2017) .....................................................14, 17

*Stevens v. Merit Sys. Prot. Bd.,*
678 F. App'x 1014 (Fed. Cir. 2017)................................................18, 19, 20

*Stoyanov v. Dep't of the Navy,*
474 F.3d 1377 (Fed. Cir. 2007) ...............................................................12

*White v. Dep't of the Air Force,*
391 F.3d 1377 (Fed. Cir. 2004) ...............................................................19

## STATUTES

5 U.S.C. § 1214(a)(3) ............................................................................................1

5 U.S.C. § 1221(a) .................................................................................................1

5 U.S.C. § 1221(e) .................................................................................................1

5 U.S.C. § 2302(a)(2) ............................................................................................1

5 U.S.C. § 2302(a)(2)(D) .....................................................................................14

5 U.S.C. § 2302(b)(8) ......................................................................................10, 14

5 U.S.C. § 2302(b)(8)(A) .....................................................................................16

5 U.S.C. § 7703(b)(1)(A) .......................................................................................1

5 U.S.C. § 7703(c) ...............................................................................................11

## <u>STATEMENT OF RELATED CASES</u>

There is no other appeal or proceeding in any other court in or from this same civil action. There are no known cases pending in this or any other court that will directly affect or be directly affected by this Court's decision in this pending petition.

<u>**STATEMENT OF JURISDICTION**</u>

On May 5, 2017, Petitioner filed an individual-right-of-action ("IRA")

appeal with the Merit Systems Protection Board ("MSPB") alleging that her

employer, the United States Department of Veterans Affairs ("VA") unlawfully

retaliated against her for making disclosures protected by the Whistleblowing

Protection Enhancement Act of 2012 (the "WPEA"). *See* 5 U.S.C. § 2302(a)(2).

The MSPB had jurisdiction to hear and determine this matter pursuant to 5 U.S.C.

§ 1214(a)(3) and 5 U.S.C. §§ 1221(a), (e).

On May 23, 2019, the MSPB issued an Initial Decision dismissing

Petitioner's appeal for lack of jurisdiction. On June 27, 2019, the MSPB's Initial

Decision became final, disposing of Petitioner's claim related to allegations that

the agency retaliated against her for making disclosures protected by the WPEA.

Accordingly, this Court has jurisdiction to review this matter pursuant to 5 U.S.C.

§ 7703(b)(1)(A).

<u>**STATEMENT OF ISSUES**</u>

1. Whether the Administrative Judge erred when he dismissed Petitioner's

    claims for lack of jurisdiction, finding that Petitioner failed to raise a non-

    frivolous allegation that Petitioner made a protected disclosure protected by

    the WPEA.

2. Whether the Administrative Judge erred by relying on Respondent's factual contradictions to Petitioner's otherwise adequate *prima facie* showing of jurisdiction.

3. Whether the Administrative Judge erred by withholding judgement as to whether Petitioner nonfrivolously alleged that Respondent took or failed to take a personnel action against her.

## STATEMENT OF THE CASE

In October 2012, the Department of Veterans Affairs hired Hessami as the Chief of Pharmacy Service at Martinsburg Veteran Affairs Medical Center ("MVAMC") and worked under the supervision of the Chief of Staff, Dr. Jonathan Fierer. *See* Appx0311-0313. In early August 2014, the MVAMC started treating roughly 46 Hepatitis C ("Hep C") patients. *See* Appx0314-0317. By the end of August 2014, the Veterans Integrated Service Network ("VISN") completed a new data collection for Hep C patients and identified 1,100 patients for Hep C treatment at MVAMC. *See* Appx0989-0994 at ¶ 4; *see also* Appx0319-0334. VISN allocated approximately $13,100,000 to MVAMC to treat Hep C patients. *See* Appx0335-0337.

In October 2014, VISN mandated that each VA facility establish an interdisciplinary team ("IDT") comprised of gastroenterologist/hepatologist, a nurse and pharmacists to discuss and monitor each Hep C patient at the facility.

2

*See* Appx0989-0994 at ¶ 5. As the Chief of Pharmacy, Hessami was designated as the point of contact for the pharmacy for VISN. *Id*. at ¶ 9. As such, Hessami educated herself about the Hep C treatment protocols and guidelines. *Id*.

Hessami learned that when prescribing Hep C drugs, it is critical that the Hep C drug match with a patient's genotype. *Id*. at ¶ 10. There are six categories of genotypes: 1, 2, 3, 4, 5, and 6. *Id*. Five of the six genotypes only require treatment for a short period of time—typically eight (8) or (12) weeks. *See* Appx0338-0390. In most cases only one category requires a patient to be treated for a course of 24 weeks. *Id*.

In the 2014 fiscal year, MVAMC started treating patients exclusively with Simeprevir and Sofobuvir ("S&S"). *See* Appx0989-0994 at ¶ 13. In November or December 2013, S&S was approved to treat genotypes 1, 2, 3, 4, and 5. *See* Appx0391-0437.  S&S were priced approximately at $1,200 per pill, however, MVAMC was able to get the drugs at a wholesale cost of $534 per pill. *See* Appx0989-0994 at ¶ 14. During this time, Hessami reported MVAMC's Hep C treatment information to Dr. Andrea Searle, VISN 5 Pharmacy Executive, and Fierer. *See id*. at ¶ 7. In pharmacy service, Hessami asked management to help Dr. Scott Fisher and herself with reporting Hep C information on a weekly basis. *Id*. at ¶ 7. The reporting information included the number of patients getting treated, weeks of therapy, genotype and drug selection. *Id*.

MVAMC had two prescribing gastroenterologists, Dr. Evelio Bravo-Fernandez and Dr. Trent Nichols. *Id* at ¶ 17. Nichols was a locum who recently started with MVAMC around August or September 2014. *Id* at ¶ 18. Although Nichols had experience with Hep C therapy, he did not have any experience prescribing Hep C drugs. *Id*.

In September 2014, Dr. Searle, VISN 5 Pharmacy Executive, provided treatment guidelines for each drug based on genotypes 1, 2, 3, 4, 5, and 6. *Id* at ¶ 16. In these guidelines, the length of treatment protocol was eight (8) and twelve (12) weeks, with extensions to 24 weeks for patients with specific genotype 3 and confirmation of cirrhosis. The most common length of therapy was 12 weeks, which is the selected length for the majority of genotypes. *Id* at ¶ 11.

In November 2014, Hessami noticed Nichols's non-compliance with the Hep C guidelines provided by VISN and PBM for the drugs. *See* Appx0989-0994 at ¶ 19-20. After noticing these compliance issues, Hessami informed Dr. Jonathan Fierer, MVAMC Chief of Staff and Dr. Deborah Bennett, Chief of Medicine for the MVAMC, about her concerns regarding Nichols's unconventional prolonged length of treatment for patients. *Id*. at ¶ 20-21. Hessami was concerned that patients were being exposed to unnecessary health risks associated with prolonged treatments. *Id*. at ¶ 21. Hessami explained to Fierer and Bennett that patients with

lengthy treatment plans were exposed to higher risks of adverse drug reactions and side effects. *Id*.

Hessami also expressed her concerns about how the lengthy treatments were impacting MVAMC's Hep C budget funds. *Id*. at ¶ 22. The money spent to treat one of Nichols's patients could have been spent on treatment for two patients if Nichols's would have been following the Hep C guidelines issued by VISN. *Id*. Hessami continued to express her concerns to Bennett during the few times Hessami assisted Bennett with establishing the Hep C IDT meetings in December 2014. *Id*. at ¶ 25.

In December 2014, the pharmacy also developed quality factors to ensure: (1) patient compliance to therapy; (2) waste prevention; (3) prescription pickups at outpatient pharmacy window instead of mailing to eliminate shipping cost to pharmacy; and (4) 14-day supply correlated with lab workup done. *Id*. at ¶ 27.

In January 2015, Hessami expressed her concern more publicly in a meeting with all the clinical service chiefs. *Id*. at ¶ 28. Hessami pointed out that Nichols was prescribing 18 weeks of treatment for patients that only needed 8 weeks of treatment based on the Hep C Guidelines and protocols. *Id*. at ¶ 30; *see also* Appx0318.

Nichols was the only doctor not prescribing treatment in accordance with VISN and PBM guidelines. Only patients with Nichols as the prescribing provider

received treatment outside of the 12 weeks and 24 weeks treatment plan. Some of Nichols's patients were scheduled for treatment for up to 48 weeks. *See* Appx0441-0727; *see also* Appx0731-0819; *see also* Appx0820-0963.

In October and November 2014, Harvoni and Viekra became available as a treatment for Hep C. *See* Appx0989-0994 at ¶ 13-15. According to PBM, these drugs were considered more effective than the previous S&S drugs. *Id*. at ¶ 15. Additionally, the VA was able to negotiate a significantly lower price on the new drugs compared to the older S&S drugs. Hessami noted in her February 17, 2015 email to Bennet, that the cost of S&S drugs combined was approximately $52,000 while the cost for Viekira was $8,000 and Harvoni was $14,000. *See* Appx0964-0972.

In January 2015, Hessami expressed her concerns regarding Hep C treatment funds with Jody Slonaker, Chief Financial Officer, and Kenneth Allensworth, Associate Director at MVAMC. *See* Appx0989-0994 at ¶ 33. Hessami informed them that the pharmacy had already spent $9,000,000 on Hep C medications. *See id*. at ¶ 34. Hessami also informed Fierer about the status of the Hep C pharmacy funds. *See* Appx0977. After VISN and Searle were made aware of the Hep C budget shortfall, they wanted an explanation. *See* Appx0989-0994 at ¶ 36. Hessami explained to Searle that Nichols did not comply with the recommending treatment protocol. *Id*. at ¶ 38.  After Searle's conversation with Hessami, Searle conferenced

into one of the IDT meetings and reiterated the treatment protocol gastroenterologist should be following for Hep C patients, specifically to Bennett and Nichols. *Id*. at ¶ 39. Searle clearly stated that all new patients must be started on Harvoni, not only for cost factors but also because the PBM had approved better efficacy for Harvoni and Vierkira. *Id*. at ¶ 40. However, Nichols continued to treat patients using the old S&S drug. *Id*. at ¶ 43.

In February 2015, Hessami continued to raise her concerns about Nichols's treatment practices and the impact on the Hep C budget. *Id*. In return, Hessami received derogatory comments from Fierer. *Id* at 29. For example, in one of Fierer's replies to Hessami's concerns, he stated: "You are a pharmacist not a physician; therefore, you should keep your opinion to yourself and let experts make decisions about Hep." *Id*. However, Hessami continued to voice her concerns at every IDT meeting to Bennet and Nichols. *Id*.

On February 12, 2015, during the IDT meeting, Hessami confronted Nichols regarding his continued use of the old, more expensive type of Hep C medications for new patients and informed him that he should be using the newer medications instead. *Id*. at 43. On February 17, 2015, Hessami sent an email to Bennet and Fierer to express her frustration with Nichols starting new patients on the old, more expensive drugs. As noted in her February 17, 2015 email, Hessami explained that Nichols's decision to start four (4) patients on the old S&S drugs would cost the

facility $208,000, which the medical center had to absorb since VISN was not reimbursing MVAMC for the cost of purchasing the old Hep C drugs. *See* Appx0964-0972.

Prior to the fiscal year, MVAMC projected its total cost for the year to treat 17 patients would be $290,645. *See* Appx0978-981. Allensworth responded that he would not recommend or request a change in treatment regimen based on cost. *See* Appx0964-0972 at 1. In response Bennett agreed with Hessami and stated that Nichols "appear[ed]" to understand that he should not place any new patients on the old S&S drug. *Id*. at 6. She further stated that she could ask Nichols to provide written explanation as to why he prescribed these medications to these six (6) patients or request that pharmacy simply not fill the prescriptions. *Id*.

While Bennett and Hessami eventually decided upon a solution to deal with Nichols's practice of prescribing old, more expensive Hep C drugs, Nichols continued to place patients on lengthy treatments that exposed them to unnecessary adverse reactions and side effects. *See* Appx0982-0985.

Consequently, management's refusal to timely address Hessami's continued complaints about Nichols's prescribing practices and budgetary concerns forced MVAMC to make an unprecedented decision to institute a moratorium on treating new Hep C patients in March 2015. *See* Appx0986-0988.

## PROCEDURAL HISTORY

On December 19, 2016, Hessami filed a complaint with the OSC. *See* Appx0007. After more than one hundred twenty (120) days passed following the filing of her complaint, Hessami filed an IRA Appeal with the MSPB on May 5, 2017. *Id*.

On January 8, 2018, the Department of Veterans Affairs filed a Motion to Dismiss for lack of jurisdiction. *See* Appx0030-0288. On January 23, 2018, Hessami filed an Opposition to the Agency's Motion to Dismiss. *See* Appx0289-0438.

On May 23, 2019, the Administrative Judge dismissed Hessami's case on the basis that Hessami had not made a non-frivolous allegation. *See* Appx0001. On August 20, 2019, Hessami filed a petition for review in this Court.

## SUMMARY OF THE ARGUMENT

This Court should reverse the MSPB decision and find that the Administrative Judge erred in applying the applicable law to Hessami's case and that his factual findings were unsupported by substantial evidence. The Whistleblower Protection Enhancement Act ("WPEA") protects several types of communications, including disclosures regarding what an employee reasonably believes to be a substantial and specific danger to public health or safety. Additionally, for purposes of determining jurisdiction, any doubts or ambiguities

as to whether Hessami raised nonfrivolous allegations of a reasonable belief should be resolved in favor of a finding that jurisdiction exists. In ruling that Hessami's disclosures were merely robust discussions on policy, the AJ weighed mere factual contradictions in favor of the Agency, which is improper at the motion to dismiss stage. Therefore, the MSPB's decision should be reversed because the AJ made factual errors in making his decision.

Throughout his decision, the AJ found that Hessami did not describe how her disclosures fell under the protections of the WPEA and that her disclosures amounted to mere disagreement, while simultaneously finding that the Agency's proffered defenses were substantiated. As such, the AJ's determinations were arbitrary and capricious. Further, the AJ's characterization of Hessami's disclosures as "mere robust debate" demonstrates a clear abuse of discretion. Thus, this Court should reverse the MSPB's decision because the AJ erred by issuing a decision unsupported by substantial evidence.

In finding that Hessami's disclosures did not constitute a nonfrivolous allegation, the AJ erred in interpreting the legal issues involved in this case. Hessami made disclosures regarding violations of 5 U.S.C. § 2302(b)(8) which constitute protected disclosures. Therefore, this Court should reverse the MSPB's decision because the AJ failed to apply the proper legal analyses in making determination of whether Hessami's disclosures constituted protected conduct.

10

## STANDARD OF REVIEW

On appeal, a Final Order or decision from the MSPB will not be upheld if a court determines that the MSPB's decision was, "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c); *see also Bennett v. Merit Sys. Prot. Bd.*, 635 F.3d 1215, 1218 (Fed. Cir. 2011). The petitioner bears the burden of establishing reversible error in an MSPB decision. *See Harris v. Dep't of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed. Cir. 1998).

While courts review the MSPB's underlying factual determinations for substantial evidence, the MSPB's legal determinations, including whether the MSPB has jurisdiction over an appeal, are reviewed *de novo*. *See Johnston v. Merit Sys. Prot. Bd.*, 518 F.3d 905, 909 (Fed. Cir. 2008); *see also Bolton v. Merit Sys. Prot. Bd.*, 154 F.3d 1313, 1316 (Fed. Cir. 1998). A court is "bound by the [Administrative Judge's] factual determinations unless those findings are not supported by substantial evidence." *See Bolton v. Merit Sys. Prot. Bd.*, 154 F.3d 1313, 1316 (Fed. Cir. 1998). The MSPB's decision will be overturned where its decision is not "supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Hogan v. Dep't of the Navy*, 218

F.3d 1361, 1364 (Fed. Cir. 2000) (quoting *Brewer v. United States Postal Serv.*, 227 Ct. Cl. 276, 647 F.2d 1093, 1096 (1981)).

## ARGUMENT

A distinction exists between the requirements necessary to prevail on the merits of a WPEA claim and those sufficient to establish board jurisdiction. *See Johnston*, 518 F.3d at 909 (Fed. Cir. 2008). To prevail on the merits, an employee must establish, by a preponderance of the evidence, that a protected disclosure was a contributing factor in an adverse personnel action. *See id*. (citing *Marano v. Dep't of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993). At the jurisdictional threshold, the employee's burden is significantly lower for individual right of action appeals, whereby, the "Board's jurisdiction is established by nonfrivolous allegations that the [employee] made a protected disclosure that was a contributing factor to the personnel action taken or proposed." *See Johnston*, 518 F.3d at 909 (quoting *Stoyanov v. Dep't of the Navy*, 474 F.3d 1377, 1382 (Fed. Cir. 2007). Thus, Hessami need only establish that her protected disclosures constituted non-frivolous allegations that: (1) her disclosures were within the purview of the WPEA; and (2) she suffered reprisal in the wake of these disclosures. *See Johnston*, 518 F.3d at 909.

At the motion to dismiss stage, all that is required by the employee is that she make non-frivolous allegations, which if proven, constitute a *prima facie*

showing of jurisdiction. *See Dumas v. Merit Sys. Prot. Bd.*, 789 F.2d 892, 894 (Fed. Cir. 1986). Such an allegation can be disposed of summarily on a document record in appropriate cases. *See Manning v. Merit Sys. Prot. Bd.*, 742 F.2d 1424 (Fed. Cir. 1984). However, this Court has held that if the alleged facts are sufficient to support a *prima facie* case of jurisdiction, the issue cannot be summarily determined adversely; the petitioner is entitled to an evidentiary hearing on the issue. *See Dumas*, 789 F.2d at 894 (citing *Manning*, 742 F.2d at 1428).

## I. Hessami's disclosures amount to far more than participation in a robust discussion on policy.

The Administrative Judge erred by concluding that Hessami's protected disclosures were merely disagreements on prescribing practices and that they amounted to no more than a larger robust debate over how to manage the high cost of Hep C medication and medication alternatives. *See* Appx0015. But because there has not yet been a hearing in this case, the Administrative Judge erred by weighing the Agency's factual contradictions to Hessami's allegations, which is insufficient to warrant a dismissal for lack of jurisdiction. *See Manning*, 742 F.2d at 1428 (finding that the MSPB order dismissing Manning's case for lack of jurisdiction was proper when the documentary evidence submitted by the agency was unrebutted).

Further, the Administrative Judge held that when an alleged whistleblower is espousing or expressing disagreement with a debatable policy decision, her

disclosures do not fall within those protected under 5 U.S.C. § 2302(b)(8). Although a disclosure regarding a policy decision that lawfully exercises discretionary authority is not a protected whistleblower disclosure, a disclosure *is* protected by the statute if the employee reasonably believes that the disclosure evidences a violation of any law, rule or regulation, or a substantial and specific danger to public health or safety. *See id*. at § 2302(a)(2)(D); *see also Standley v. Merit Sys. Prot. Bd*., 715 F. App'x 998, 1001 (Fed. Cir. 2017).

Hessami did far more than simply discuss policy. Hessami raised concerns about a doctor's failure to follow policies and guidelines issued by VISN and PBM and how his failure to follow these policies exposed patients to heightened risk of adverse reactions and side effects. *See* Appx0989-0994. Hessami also expressed concerns about the budget shortfall created by Dr. Nichols's treatment practices, which ultimately led to MVAMC taking the unpreceded step of implementing a moratorium on new patients. *See* Appx0986-0988.

The Administrative Judge relies on *O'Donnell* to support the position that debatable policy decisions regarding the exercise of discretion are categorically outside of the WPEA. But *O'Donnell* involved a soil conservationist at the Department of Agriculture who disagreed with his supervisor's determination that a landowner was not eligible for a grant. *See O'Donnell v. Merit Sys. Prot. Bd*., 561 F. App'x 926, 927-28 (Fed. Cir. 2014). O'Donnell then ignored his

14

supervisor's determination and testified in favor of the landowner's position at an appeal and was later suspended for three days for failure to follow supervisory instructions. *Id*. at 928. In contrast, Hessami alleges protected activity that meets the categories covered by the WPEA. Hessami's disclosures regarding Nichols's lengthy treatment and practice of prescribing old, more expensive Hep C drugs concerned behavior that Hessami reasonably believed put patient's health and safety at risk and impacted the Agency's ability to treat Hep C patients. *See* Appx0989-0994 at ¶ 20-21, 28-29, 38. Hessami, then, does not merely allege that her supervisors at the VA exercised their discretion in a manner with which she disagreed.

The Administrative Judge further relies upon *Ormond*, which held that a disclosure of gross mismanagement excludes management decisions which are merely debatable. *See Ormond v. Dep't of Justice*, 118 M.S.P.R. 337, ¶ 11 (2012). However, the Administrative Judge did not take into consideration the danger to public health or safety. *See Chambers v. Dep't of Interior*, 515 F.3d 1362, 1368 (Fed. Cir. 2008) (holding that the MSPB erred when it failed to distinguish disclosures of a danger to public health or safety from allegation of gross mismanagement). Hessami certainly expressed a disagreement with a policy decision, but she also disclosed a danger to public safety that may have resulted from that decision. Hessami identified that by Nichols's refusal to abide by the

VISN and PBM guidelines, the funding allotted to treat the identified 1,100 Hep C patients would be unnecessarily depleted by purchasing and using the older more expensive drug, which would limit the number of patients the MVAMC could treat. *See* Appx0989-0994.

Hessami met her pleading standard of alleging that her disclosures went beyond policy discussions and that she reasonably believed she disclosed the misconduct covered by the Whistleblower Protection Enhancement Act.

**II.  Hessami has presented ample evidence that she had a reasonable belief that her disclosures were protected under the WPEA.**

In order to prevail on a claim under the WPEA, an employee must show that she disclosed information that she reasonably believed "evidences (1) a violation of law, rule, or regulation, or (2) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety. 5 U.S.C. § 2302(b)(8)(A); *see Reid v. Merit Sys. Prot. Bd*., 508 F.3d 674, 678 (Fed. Cir. 2007) (holding that to make a disclosure protected by the WPEA, a whistleblower need only disclose what he reasonably believes is an imminent-not actual-violation of law, rule, or regulation). The test to determine if a petitioner had a reasonable belief that her disclosure evidenced wrongdoing asks whether a "disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee [could] reasonably conclude that the actions of the

government evidenced such wrongdoing. *See Standley*, 715 F. App'x at 1001 (quoting *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999)).

a. **Violations of law, Rule, and Regulation**

The Administrative Judge held that Hessami failed to allege how her disclosures violated any specific law, rule, or regulation. *See* Appx0014. However, an employee is not required to identify a statutory or regulatory provision by title or number, when the employee's statements and the circumstances surrounding the making of those statements clearly implicate an identifiable violation of law, rule, or regulation. *See Langer v. Dep't of Treasury*, 265 F.3d 1259, 1266 (Fed. Cir. 2001). Further, a report of repetitive violations of even minor rules or regulations can constitute a disclosure protected under the WPEA. *See Herman v. Dep't of Justice*, 193 F.3d 1375, 1381 (Fed. Cir. 1999).

In this case, Hessami raised concerns about a doctor's failure to follow policies and guidelines issued by VISN and PBM and how his failure to follow these policies exposed patients to heightened risk of adverse reactions and side effects. *See* Appx0989-0994 ¶ 20-22. Nichols's patients were the only patients that were prescribed outside of the 12 weeks and 24 weeks treatment guidelines provided by VISN. Some of Nichols patients were scheduled for treatment for up to 48 weeks. *See* Appx0441-0727; Appx0731-0819; Appx0820-0963.

### b. Gross Waste of Funds

A gross waste of funds is defined as a more than debatable expenditure that is significantly out of proportion to the benefit reasonably expected to accrue to the government. *See Stevens v. Merit Sys. Prot. Bd.*, 678 F. App'x 1014, 1017 (Fed. Cir. 2017).

In this case, Hessami alleges that in the midst of a budget shortfall, she disclosed that the practices at the Martinsburg VA would result in fewer patients receiving adequate healthcare while the Agency spent more money. Thus, Hessami alleged that the practices would lead to a significant reduction in the Agency's ability to provide treatment to veterans who had Hepatitis C. Furthermore, on February 17, 2015, Hessami disclosed that Nichols' decision to start four (4) patients on the old S&S drugs would cost the facility $280,000. *See* Appx0964-0972 at 4. Prior to the 2015 fiscal year, MVAMC projected its total cost for the year to treat 17 patients would be $290,645. *See* Appx0978-0981. Based on the Agency's expectation, the Agency would only have $10,645 to treat13 other patients for the remaining fiscal year.

### c. Gross Mismanagement

The Board has defined gross mismanagement as "a management action or inaction that creates a substantial risk of significant adverse impact upon the agency's ability to accomplish its mission." *See Stevens v. Merit Sys. Prot. Bd.*,

18

678 F. App'x 1014, 1017 (Fed. Cir. 2017). For gross mismanagement, the employee must disclose "such serious errors by the agency that a conclusion the agency erred is not debatable among reasonable people," and the matter that is the subject of the disclosures must be "significant." *Id*. (quoting *White v. Dep't of the Air Force*, 391 F.3d 1377, 1382 (Fed. Cir. 2004). The WPEA however, does not require that whistleblowers establish gross mismanagement by irrefragable proof. *See White v. Dep't of Air Force*, 391 F.3d 1377, 1381 (Fed. Cir. 2004). Rather, the proper test is whether a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee reasonably conclude that actions of the government evidenced gross mismanagement. *Id*. As the Court held in *White*, the WPEA does not include a blanket exception for policy disputes between the employee and the agency. *Id*.

Here, Hessami has alleged that her unanswered concerns to management about Nichols's treatment and its impact on the Hep C budget forced the MVAMC to take the unprecedented decision to institute a moratorium and render it unable to treat new Hep C patients. *See* Appx0989-0994 at ¶ 44. In fact, Hessami has alleged that the disclosures she made concerned practices at the VA which would have allowed fewer patients to be treated while more dollars were actually spent. *See* Appx0989-0994 at ¶ 22. And Hessami made these disclosures in the context of a budget shortfall. *See id.* ¶ 29. Thus, Hessami alleged more than simple de minimis

19

mismanagement with which she disagreed. Hessami has, instead, alleged that she disclosed blatant practices that would impair the Agency's ability to carry out its mission – providing healthcare to veterans.

### d. Abuse of Authority

The MSPB has defined an abuse of authority as an "arbitrary or capricious exercise of power by a federal official or employee that adversely affects the rights of any person or that results in personal gain or advantage to himself or to preferred other persons." *See Stevens v. Merit Sys. Prot. Bd.*, 678 F. App'x 1014, 1017 (Fed. Cir. 2017) (quoting *Ramos v. Dep't of the Treasury*, 72 M.S.P.R. 235, 241 (1996)). The test to determine whether a disclosure evidenced an abuse of authority asks whether a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee could reasonably conclude that the actions of the government evidenced such wrongdoing. *See Hansen v. Merit Sys. Prot. Bd.*, 746 F. App'x 976, 980 (Fed. Cir. 2018)(quoting *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999)).

In this case, Hessami disclosed to multiple management officials her concerns regarding Nichols's treatment practices and the impact they were having on the Hep C budget funds. *See* Appx0989-0994 ¶ 21, 22, 34. Hessami's concerns regarding patient care and safety and budget shortfalls were left unanswered and unaddressed. *See id.* ¶ 44. Consequently, management's refusal to address these

issues forced MVAMC IDT for Hep C, led by Bennett to make an unprecedented decision to institute a moratorium on treating new Hep C treatments in March 2015. *See id.* ¶ 44. This decision affected the right of veterans with Hep C and their ability to obtain adequate medical care from their facility.

e. **Danger to Public Health and Safety**

The Administrative Judge erred by applying an incorrect and overly narrow standard for what constitutes a protected disclosure of a risk to public health or safety. *See* Appx0013-0014. The Administrative Judge found that Hessami did not allege a specific danger to public safety and health with sufficient specificity that would deem the disclosure protected under the WPEA. *See* Appx0014. However, in *Chambers v. Department of Interior*, the court laid out a multi-factor test for this avenue of protected activity. Under *Chambers*, the first factor is "the likelihood of harm resulting from the danger." *Chambers v. Dep't of Interior*, 515 F.3d 1362, 1369 (Fed. Cir. 2008) (*Chambers II*). The second is "when the alleged harm may occur." *Id*. In a subsequent opinion on the same case, the Federal Circuit articulated a third prong – "the nature of the harm," i.e., "the potential consequences." *Chambers v. Dep't of Interior*, 602 F.3d 1370, 1376 (Fed. Cir. 2010) (*Chambers III*). Under *Chambers II*, a disclosure of a practice that "could only result in harm under speculative or improbable conditions" is not protected. *Chambers II*, 515 F.3d at 1369. Likewise, a harm that would occur in the

immediate or near future is more likely to constitute a protected disclosure than a harm that may arise only in the distant future. *Id*. And a disclosure under this prong may be protected if it discloses harm that has already occurred. *Chambers III*, 602 F.3d at 1376.

Here, Hessami alleged her disclosures of Nichols's unconventional prolonged length of treatment for patients were based on the risks to patients' health due to the exposure caused by lengthy treatment that were exponentially higher than the national Hep C protocol. *See* Appx0989-0994 ¶ 20-21, 28-29, 38. Hessami explained that patients with lengthy treatment plans were exposed to unnecessary adverse drug reactions and side effects. *See id.* Hessami, then, has alleged that she disclosed that there was a high likelihood of harm resulting from the Agency's practices – namely that patients would receive improper treatments and that the practices' effect on the Agency's budget would result in a decrease in services to patients. *See id.* ¶ 22. Hessami disclosed what she reasonably believed would be the gravity or consequences of the harm – that veterans of the United States military would not receive proper treatments for Hepatitis C.

## CONCLUSION

Petitioner has demonstrated nonfrivolous allegations that she made protected disclosures within the meaning of WPEA to superiors within the Agency. Petitioner has also shown that the Agency took a number of prohibited personnel

practices against her within close temporal proximity to her disclosures. Accordingly, Petitioner respectfully requests that this Court reverse the Administrative Judge's decision to dismiss Petitioner's claims for lack of jurisdiction and allow Petitioner's case to proceed to a Hearing on the merits of her appeal.

Respectfully Submitted,

/s/ Kellee Boulais Kruse
Kellee Boulais Kruse
R. Scott Oswald
THE EMPLOYMENT LAW GROUP, P.C.
888 17th Street, NW, Suite 900
Washington, DC  20006
(202) 261-2838
kkruse@employmentlawgroup.com
soswald@employmentlawgroup.com
*Counsel for Petitioner*



# ADDENDUM

# TABLE OF CONTENTS

**Pages**

MSPB – Initial Decision
    filed May 23, 2019.........................................................................Appx0001

# UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD
### NORTHEASTERN REGIONAL OFFICE

| | |
|---|---|
| NEGAR HESSAMI , | DOCKET NUMBER |
| Appellant, | PH-1221-17-0271-W-2 |
| v. | |
| DEPARTMENT OF VETERANS AFFAIRS, | DATE: May 23, 2019 |
| Agency. | |

<u>Kellee B. Kruse</u>, Esquire, Washington, D.C., for the appellant.

<u>Shelly S. Glenn</u>, Esquire, Baltimore, Maryland, for the agency.

<u>Xan DeMarinis</u>, Esquire, Washington , D.C., for the agency.

**BEFORE**
Michael T. Rudisill
Administrative Judge

## INITIAL DECISION

On May 5, 2017, the appellant filed an individual-right-of-action (IRA) appeal with the Merit Systems Protection Board (Board) alleging that the agency retaliated against her for making disclosures protected by the Whistleblowing Protection Enhancement Act of 2012 (the "WPEA"). Although she requested a hearing, the appellant is not entitled to one because she failed to make a non-frivolous allegation that the Board has jurisdiction to hear her appeal. *See Hardy v. Merit Systems Protection Board*, 13 F.3d 1571,1575 (Fed. Cir.), *cert. denied*, 512 U.S. 1235 (1994). For the reasons set forth below, the appeal is DISMISSED for lack of jurisdiction.

## JURISDICTION

<u>Background</u>

The following facts are essentially undisputed: On October 21, 2012, the appellant was hired as Chief of Pharmacy, GS-14, at the VA Medical Center located in Martinsburg, West Virginia (MBVAMC). *See* W-1 File (W1F), Tab 1. In the summer of 2014, the FDA approved for use new drugs which actually cured Hepatitis C (Hep C). Accordingly, the VA nationwide pushed an initiative to get those drugs to veterans. *See* W-2 File (W2F), Tab 2, Exhibit 1 (Affidavit of Deborah Bennett). Dr. Deborah Bennett, Chief of Medicine for the MBVAMC, was tasked with overseeing the Hep C program for the MBVAMC. She set up a Hepatitis Interdisciplinary Team (HIT) comprised of the prescribing providers, representatives from fiscal, social workers, nursing staff and representatives from the pharmacy. The HIT met weekly to discuss the program, budget issues, and treatment options. Each patient's treatment plan was also discussed with the Team and approved by the group. *Id*. In 2014 and 2015, Dr. Trent Nichols and Dr. Evelio Bravo-Fernandez were the primary prescribing providers for Hepatitis C. At the outset, the drugs were prescribed in courses between 8 and 24 weeks, depending on the patient's genotype, individual patient needs, prior treatment and response, and liver disease progression. The use and treatment guidance for the new Hep C medications, however, was constantly changing. Accordingly, clinical discretion exercised by the prescribing providers was very much a part of the treatment guidance. *Id*. at Exhibits 4 and 5.

By November 2014, the VISN1[1] had set up a funding source for Hep C medications separate from each medical center budget. At MBVAMC, all orders and monies related to the program were in a Special Purpose Fund administered by the Medical Center's Chief Financial Officer, Jody Slonaker. *Id*. (Bennett

---

[1] "VISN" stands for VA Integrated Service Network. VISNs are the Regional offices that oversee the VA Medical Centers in a certain region. The MBVAMC is in VISN5.

Affidavit); Exhibit 2 (Deposition of Jody Slonaker dated September 20, 2017 at T16; Exhibit 20 (Deposition of Dr. Negar Hessami dated September 12, 2017 at T57). In late 2014 and continuing into 2015, new drugs and new combination of drugs were approved by the FDA. *Id*. at Exhibit 1 (Bennett Affidavit). At the end of November 2014, VHA recommended that providers delay starting treatment of patients with less clinical urgency until late January 2015 in order to allow the agency to negotiate lower prices for the new medications. *See* W2F, Tab 2, Exhibit 6. As a result, Dr. Bennett discussed with the HIT issues of patient care, selection and prioritization. *Id*.

During this time, the guidance within the agency and within the Hepatology community on treatment and criteria for treatment (who to treat) was constantly evolving and changing. For example, during this time, the VA Pharmacy Benefits Management Service (PBS) circulated several revised "Criteria for Use" (CFUs) for the Hep C medications. The CFUs were a guide for treatment only. Evidently, strict adherence was never contemplated and clinical discretion was always built in. *See* W2F, Tab 2, Exhibit 1 (Bennett Affidavit); Exhibit 14. As CFO, Jody Slonaker, was ultimately in charge of the Hep C Special Purpose Fund for the MBVAMC. *See* W2F, Tab 2, Exhibit 2 (Slonaker Dep. at T19); Exhibit 20 (Appellant Dep. at T57). In December, CFO Jody Slonaker, and others raised concerns regarding the cost of the Hep C medications and the volume of potential patients to be treated. *Id., see also* Exhibits 7-10. Dr. Jonathan Fierer, MBVAMC Chief of Staff, responded that he reached out to the VISN and the VISN assured him that funding would be available. Dr. Fierer instructed that "we will proceed at the current pace." *See* W2F, Tab 2, Exhibit 9. MBVAMC leadership, including Mr. Kenneth Allensworth, Associate Director, also advised the HIT that the treatment of patients was the priority and that the MBVAMC would seek additional funding, if needed from the VISN. *See Id*., at Exhibit 1 (Bennett Affidavit); Exhibits 7-10; Exhibit 2 (Slonaker Deposition at T37-38

(leadership's mantra that was "preached to us in every meeting … [was] that we will not let a dollar stand in the way of patient safety").

On January 4, 2015, the appellant herself reiterated leadership's mantra in response to budget concerns raised by her subordinate Scott Fisher, Pharmacy liaison to the HIT. The appellant reassured Fisher that the Medical Center Director "said we will not turn down any patients because of funding." *See* W2F, Tab 2, Exhibit 11. The VISN also assured the MBVAMC staff that they were monitoring the situation "weekly." *Id*., at Exhibit 9; Exhibit 20 (Appellant Deposition at T57-58 (VISN monitored the Hep C program closely and noting that they knew "second by second" every pill that was dispensed). This was just part of what CFO Slonaker described as the "constant communication with this funding." These budget concerns were not unique to the MBVAMC, but were part of a larger discussion about the Hep C program and funding nationwide. *Id*., at Exhibit 1 (Bennett Affidavit; Exhibit 2 (Slonaker Deposition at T27).

During this time, the guidance within the agency and the clinical community regarding who to treat, how to treat, and what medications to use was dynamic and constantly changing. *See* W2F, Tab 2, Exhibit 1 (Bennett Affidavit). At the end of January, based on a question that he received from fiscal, Dr. Fierer asked the HIT why patients had not been switched over to the new medications. Dr. Bennett called a meeting on January 29, 2015, to discuss this issue. *Id*., *see also* Exhibits 12 and 13. The appellant attended that January 29, 2015 meeting, where, after discussion, the HIT agreed that patients who were already on the older medications and/or had treatment plans which had already been reviewed and approved by the HIT would continue on their plans using the older medications. They also agreed to temporarily delay starting new patients on the Hep C treatment while they looked over past results and patient data. *Id*. On February 9, 2015, VHA emailed all Pharmacy Chiefs, including the appellant, because questions concerning the cost of Hep C drugs and patients' treatment regimens had been raised nationwide. VHA clarified that the CFUs are designed

to "assist VA providers in selecting Hepatitis C drugs that will achieve the desired therapeutic outcome based on patients' clinical needs." (Emphasis added). *See id*., at Exhibit 14; Exhibit 1 (Bennett Affidavit). In that email, VHA also stated that cost of treatment should only be a factor when both therapies are equally safe and effective. "Providers should decide which therapy is clinically most appropriate for the patient and when two therapies are equally safe and effective, then cost of treatment should be a consideration." *Id*. The email was discussed at the HIT Meeting on or about February 12, 2015, which the appellant attended. *See* W2F, Tab 2, Exhibit 1 (Bennett Affidavit).

On February 17, 2015, the appellant sent an email to Dr. Bennett and CFO Slonaker expressing frustration that Dr. Nichols started a few new patients on the older, more expensive Hep C treatments despite their earlier discussions to hold off on new starts. In the email she "humbly ask[ed]" Dr. Bennett to monitor his ordering practices pointing out the difference in costs between the older and newer medications. *See* W2F, Tab 2, Exhibit 16; Exhibit 1 (Bennett Affidavit). CFO Slonaker responded that same day stating that he and Mr. Allensworth had been discussing that very issue, and adding Mr. Allensworth to the discussion. Mr. Allensworth reiterated that he would not recommend a change in treatment because of budgetary concerns. Mr. Allensworth also stated that he and CFO Slonaker would continue to work with the VISN for appropriate funding. *Id*., at Exhibit 16. Dr. Bennett also responded indicating that she had discussed the new starts with Dr. Nichols and the HIT team, explaining that most of the seeming "new start" patients were actually patients who were previously promised treatment before the temporary hiatus. She assured MBVAMC leadership that Dr. Nichols had done Hepatology research and was well versed in Hep C treatment. She also indicated that Dr. Nichols was in "close contact" and consulting with Dr. Bravo, the other Hep C prescribing provider, concerning his treatment of patients. *Id*., at Exhibit 1 (Bennett Affidavit); Exhibit 16. Dr. Bennett also spoke with the appellant directly about the concerns she raised in her

February 17, 2015 email. As a result of discussions and collaboration with the appellant, a new protocol was developed which, Dr. Bennett shared with the HIT and management. *Id*., at Exhibit 1 (Bennett Affidavit); Exhibits 17, 18. The very next day, via email dated February 18, 2015, Dr. Bennett advised both the HIT and management that she and the appellant had discussed the issue regarding the use of older medications and determined that going forward, the two older medications would be blocked from ordering until she could discuss the "necessity" of such orders with Dr. Nichols before the order could be filled. *Id*. The appellant did not mention anything about length of treatment in her February 17, 2015 email. *Id*., at Exhibit 16; Exhibit 20 (Appellant Dep. at T76). Nor did the appellant mention any patient safety concerns in her February 17, 2015 email. *Id*. It appears that the appellant's concerns about the new Hep C medications and length of treatment were focused on the budgetary impact. In her affidavit, Dr. Bennett stated that the appellant did not raise with her, nor was there ever a concern over patient safety with Dr. Nichols's prescribing practices. Dr. Nichols's treatment plans were discussed with the HIT, wherein he would always present research and documentation to support his treatment approach; and the HIT always approved his treatment plans and medications chosen. Dr. Bennett further stated in her affidavit that there were no concerns about patient safety. With respect to length of treatment, only a small number of patients were extended beyond the typical course, but those cases presented complex clinical issues and Dr. Nichols looked at their clinical needs based on his long history and experience. Dr. Nichols monitored the patients' lab values and all cases were presented, justified by research, and approved by the HIT. Dr. Nichols's treatment choices were "recognized as a standard of care and cited in current literature sources." *See* W2F, Tab 2, Exhibit 1 (Bennett Affidavit). There were also clinical reasons to support the use of the older drugs over the newer, less expensive drugs. *See, e.g*., Exhibit 19; Exhibit 1 (Bennett Affidavit).

After Spring 2015, the appellant did not participate in the HIT meetings with any regularity, if at all, and did not raise additional concerns concerning the budget and/or length of treatment regarding Hepatitis C medications. *Id*. Dr. Bennett stated in her affidavit that the appellant seemed satisfied with the outcome of her February email. *See id*., at Exhibit 20 (Appellant Dep. at T70) (stating that she raised concerns with Dr. Bennett, Dr. Bennett spoke with Dr. Nichols, and that she felt her concerns were addressed). By the end of FY2015, the MBVAMC was fully funded for its Hep C medications by the VISN. *See* W2F, Tab 2, Exhibit 2 (Slonaker Dep. at T21-22).

In September 2016, an Administrative Board of Investigation (ABI) was convened to investigate claims of hostile work environment made by the Pharmacy Staff against the appellant. Substantial testimony and documentary evidence was collected, and the ABI substantiated many of the complaints against the appellant. On September 22, 2016, the agency proposed the demotion and suspension of the appellant based on Charges of Conduct Unbecoming and Conduct Unbecoming a Supervisor. The appellant provided her response on November 1, 2016. After considering the evidence file, the appellant's response, and the *Douglas* Factors, Medical Center Director Timothy J. Cooke sustained the demotion and suspension.

Subsequently, on December 19, 2016, the appellant, through counsel, filed a complaint with OSC which acknowledged receipt of the complaint in a letter dated February 13, 2017. 120 days having expired with no action from OSC, this IRA appeal to the Board ensued.

Burden of Proof and Jurisdictional Standard

By Order on Jurisdiction issued May 8, 2017, the appellant was apprised of the requirements for establishing that the Board has jurisdiction to hear her IRA appeal. *See* W1F, Tab 2. The appellant was informed that she bears the burden of proving the Board's jurisdiction over her appeal by a preponderance of the

evidence. *See* 5 C.F.R. § 1201.56(b)(2)(A). She was also informed that, to establish the Board's jurisdiction over an IRA appeal, she must have exhausted her OSC remedies and make nonfrivolous allegations that: (1) she made a protected disclosure described under 5 U.S.C. § 2302(b)(8) or engaged in protected activity as specified in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D); and (2) the disclosure or protected activity was a contributing factor in the agency's decision to take or fail to take a personnel action as defined by 5 U.S.C. § 2302(a)(2)(A). *Id*; 5 U.S.C. §§ 1214(a)(3),1221; *Salerno v. Department of the Interior*, 123 M.S.P.R. 230, ¶ 5 (2016); *see Yunus v. Department of Veterans Affairs*, 242 F.3d 1367, 1371 (Fed. Cir. 2001).

<u>The appellant exhausted her OSC remedies</u>

As the Jurisdiction Order noted, the appellant must have exhausted her administrative remedy with OSC. This requires she show that she filed a complaint with OSC, sought corrective action, and exhausted OSC's procedures. *See* W1F, Tab 2 at 2. An appellant has "exhausted" OSC's procedures where: (1) OSC has notified her it is terminating its investigation into her complaint; or (2) 120 days have passed since she filed her claim with OSC and she has not received such a termination notice.

The Board has jurisdiction to consider only the disclosures and personnel actions the appellant raised before OSC. *See Mason v. Department of Homeland Security*, 116 M.S.P.R. 135, ¶ 8 (2011). She must therefore prove she exhausted her administrative remedy with OSC; merely making nonfrivolous allegations she did so is insufficient. *Id*., ¶ 9. Moreover, to satisfy the exhaustion requirement, the appellant must have informed OSC of the precise ground of her charge of whistleblowing, giving OSC a sufficient basis to pursue an investigation that might lead to corrective action. *Id*. An appellant may demonstrate exhaustion by submitting her initial OSC complaint, evidence that she amended the original complaint, including but not limited to OSC's determination letter and other

letters from OSC referencing any amended allegations, and the appellant's written responses to OSC referencing the amended allegations. *Id*.

The record establishes that the appellant filed a complaint with the United States Office of Special Counsel (OSC) on December 19, 2016 (OSC File No. MA-16-5437), *see* W1F, Tab 1, Exhibit1, and that more than 120 days have passed since the appellant filed her complaint with the OSC on December 19, 2016 with no final action from OSC.

Moreover, a review of the appellant's submissions demonstrates, and I find, that she exhausted her OSC administrative remedy as to the following alleged disclosures and alleged personnel actions:

Disclosures

A. On December 18, 2014, to Mr. Slonaker, Dr. Fierer, Ms. Heather Danner, and Mr. Allensworth regarding the use of Hep C funds and budget constraints.

B. In January 2015, Dr. Hessami notified Dr. Fierer and Dr. Bennett that Dr. Nichols was not following Hep C prescription protocol.

C. In January 2015, Dr. Hessami disclosed to Mr. Allensworth and Mr. Slonaker that the pharmacy already spent $9 million of their allotted budget for Hep C medications.

D. In February 2015, Dr. Hessami discussed her concerns about the Hep C treatment performance measures and treatment strategy in a conversation with Dr. Fierer.

E. On February 12, 2015, Dr. Hessami stated to Dr. Nichols during weekly pharmacy meetings that he was using an old, more expensive type of Hep C medication for new patients and that he should use the newer medications instead.

F. On February 17, 2015, Dr. Hessami informed Dr. Bennett and Dr. Fierer via e-mail about her concerns with Dr. Nichols's Hep C treatment

strategy, specifically starting new patients on unnecessarily expensive treatments.

G. On February 25, 2015, Dr. Hessami informed Mr. Slonaker via email that the pharmacy needed a budget increase because spending "got so out of control" as a result of Dr. Nichols's expensive treatment strategy.

H. On May 4, 2015, Dr. Hessami provided her recommendation on Hep C treatment options that satisfy budget needs to Mr. Slonaker, Dr. Fierer, Mr. Allensworth, Ms. Patricia Dorsey and Ms. Bennett via e-mail.

I. On May 7, 2015, Dr. Hessami reiterated her concerns about pharmacy budgeting in light of the expensive Hep C medication to all pharmacy staff and technicians via e-mail.

J. On June 17, 2015, during a pharmacy staff meeting, Dr. Hessami stated her concerns about pharmacy procurement expenditures and the Hep C budget.

K. On June 30, 2015, Dr. Hessami stated her concerns about the Hep C budget by directing Dr. Fierer, Mr. Slonaker, Dr. Bennett, Mr. Allensworth, and Ms. Jordan to use the new Hep C drugs (Harvoni and Vikera) instead of the older, more expensive drug via e-mail.

L. On July 1, 2015, Dr. Hessami further reiterated her concerns about pharmacy budget shortfalls as a result of Hep C treatments via email to Ms. Andrea Searle, Mr. Daniel Luttrell, and Ms. Meghan Roth.

M. On August 13, 2015, Dr. Hessami mentioned the pharmacy overspending on Hep C medications leading to budget shortfalls. In response, Dr. Fierer asked Dr. Hessami to not speak publicly about this issue.

N. On August 20, 2015, during a pharmacy staff meeting, Dr. Hessami again stated her concerns about pharmacy procurement expenditures and the Hep C budget.

O. On October 21 and 22, 2015, Dr. Hessami discussed daily spending issues, specifically procurement overspending in light of Hep C pharmacy budgetary constraints in her AIB testimony.

P. On November 1, 2016, Dr. Hessami reiterated her status as a whistleblower in her written response to the charges set forth in the notice of proposed demotions and suspension.

Q. On November 7, 2016, Dr. Hessami again noted her status as a whistleblower in her oral response to the charges set forth in the notice of proposed demotion and suspension.

*See* W1F, Tab 1.

The appellant alleged that the above-listed disclosures evidenced:

i.    Violation of law, rule, or regulation

ii.   Substantial and specific danger to public health or safety

iii.  Gross mismanagement

iv.   Gross waste of funds

v.    Abuse of authority.

Personnel Actions

As a result of the above-listed disclosures, the appellant alleges that in August 2015, Ms. Miller filed an OIG complaint against the appellant because of her attempts to manage pharmacy spending. Additionally, the appellant was unofficially suspended from her position as Chief of Pharmacy on September 16, 2015, and moved to the sixth floor and ordered to complete pharmacy mailers. Following this removal, an AIB review was convened against the appellant on September 17, 2015. She then "suffered through an unnecessarily long and stressful review which took over one year to complete, during which time she lived in perpetual fear of being terminated." On September 26, 2016, as a result of her disclosures, the Martinsburg VAMC noticed the appellant with a proposed demotion and fourteen-day suspension. Finally, on December 8, 2016, the

appellant was issued the Decision of Demotion and Suspension, detailing a fourteen-day suspension and demotion to Home Based Primary Care Clinical Pharmacy Specialist GS-0660-13.

Based on the record, I find that the appellant has borne her burden of proving that she exhausted her OSC remedy as to the above-listed disclosures and personnel actions.

<u>The appellant failed to nonfrivolously allege that she made protected disclosures</u>

As the appellant was notified in the jurisdictional order, in addition to exhausting her remedy with OSC, she must also make nonfrivolous allegations that: (1) she engaged in whistleblowing activity, meaning that the disclosure(s) she made or other protected activity in which she engaged are protected under the WPEA; and (2) this protected disclosure(s) or activity was a contributing factor in the agency's decision to take or fail to take one of the personnel actions listed at 5 U.S.C. § 2302(a). Allegations are generally considered nonfrivolous when they are made under oath or penalty of perjury and are more than conclusory, plausible on their face, and material to the legal issues in the appeal. *See* 5 C.F.R. § 1201.4(s).

A protected disclosure is defined as "a formal or informal communication or transmission, but does not include a communication concerning policy decisions that lawfully exercise discretionary authority unless the employee or applicant providing the disclosure reasonably believes that the disclosure evidences—(i) any violation of any law, rule, or regulation; or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety." *See* 5 U.S.C. § 2302(a)(2)(D); *see* 5 U.S.C. § 2302(b)(8).

A whistleblower need not prove that the matter she disclosed actually established any of the conditions described in section 2302(b)(8). Instead, she must make a nonfrivolous allegation that the matter she disclosed was one that a

reasonable person in her position would believe evidenced any of these conditions. *See Chambers v. Department of the Interior*, 515 F.3d 1362, 1367 (Fed. Cir. 2008). A belief is reasonable if a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the appellant could reasonably conclude the government's actions fall within one of the categories of wrongdoing listed in section 2302(b)(8)(A). *See Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999) *cert. denied*, 528 U.S. 1153 (2000). To establish that she made a nonfrivolous allegation, the appellant must provide more than vague and conclusory allegations of wrongdoing. *See McCorcle v. Department of Agriculture*, 98 M.S.P.R. 363, ¶ 21 (2005).

The appellant summarily characterizes her alleged disclosures as evidence of the following categories listed in 5 U.S.C. § 2302(b)(8)(A): violations of law, rule and regulation; gross waste and mismanagement and abuse of authority; and a danger to public health and safety. *See* W1F, Tab 1, Exhibit 1. Gross mismanagement means a management action or inaction that creates a substantial risk of significant adverse impact upon the agency's ability to accomplish its mission. *See White v. Department of the Air Force*, 63 M.S.P.R. 90, 95 (1994). An abuse of authority occurs when a Federal official or employee arbitrarily or capriciously exercises power and adversely affected anyone's rights or causes personal gain or advantage to himself or to someone he prefers. *See Webb v. Department of the Interior*, 122 M.S.P.R. 248, ¶ 10 at n.3 (2015). To nonfrivolously allege a danger to health or safety an appellant must identify a substantial, specific harm, either one that has occurred or is likely to occur. *See Chambers v. Department of the Interior*, 602 F.3d 1370, 1376 (Fed. Cir. 2010).

The appellant does not describe with any specificity how her alleged disclosures comprise any of these categories of disclosures. She does not allege that any of the actions described would result in personal gain to any person or would involve any excessive expenditure of federal funds. She does not allege that the disclosed actions violated any <u>specific</u> law, rule, or regulation, nor does

she adequately explain how they constituted a substantial and <u>specific</u> danger to public health or safety.[2] Finally, as to her allegation of gross waste of funds, the appellant has failed to explain why the agency's expenditures with respect to the Hep C program were out of proportion to the benefit reasonably expected to accrue to the government. Thus, her allegations in this regard are mere conjecture and she has therefore failed to allege nonfrivolously that she had a reasonable belief that these assertions fell into any of the categories in 2302(b)(8).

Indeed, most of the verbal and nonverbal (emails) communications that the appellant argues are protected disclosures consist of workaday communications concerning ongoing operations in the Hep C program. For example, those designated as disclosures "a, through o" above address her efforts to implement changes, in particular data driven measures of care, to which other stakeholders in the Hep C initiative expressed opposition. Most of those same alleged protected disclosures evidenced the appellant's disagreement over questions of policy. Thus, these alleged protected disclosures do not communicate any type of disclosure but instead evidence robust debate on how the effectiveness of the Hep C care should be measured and how disputes concerning such treatment should be managed. Questions of how to deal with workplace disputes and whether it is the quality or quantity of the care that should measure effectiveness are, as indicated by these communications, fairly debatable ones.

When an alleged whistleblower is espousing or expressing disagreement with fairly debatable policy decisions, her disclosures do not fall within those

---

[2] In response to requests for admissions, the appellant admitted that she did not have any information that patients were put at risk by Dr. Nichols's treatment plans for Hep C. *See* W2F, Tab 2, Exhibit 3 (Appellant's Response to Request for Admission No. 11); Appellant Dep, at T70. The appellant further admitted that no patients were denied medications because of the budget issues she outlined. *Id.*

protected under 5 U.S.C. § 2302(b)(8). *See O'Donnell v. Department of Agriculture*, 120 M.S.P.R. 94, ¶ 14 (2013) (holding that the appellant's alleged protected disclosure was "exactly the type of fairly debatable policy dispute that does not constitute gross mismanagement"), *aff'd*, 561 F. App'x 926 (Fed. Cir. 2014); *Ormond v. Department of Justice*, 118 M.S.P.R. 337, ¶ 11 (2012)(a disclosure of gross mismanagement excludes management decisions which are merely debatable). This did not change after the more expansive disclosures provisions of the WPEA took effect in 2012. *Webb*, 122 M.S.P.R. 248, ¶ 9 (stating that, even under the expanded protections afforded to whistleblowers under the WPEA, general philosophical or policy disagreements are not protected unless they separately constitute a protected disclosure of one of the categories of wrongdoing listed in 5 U.S.C. § 2302(b) (8)(A).

In *Webb*, 122 M.S.P.R. 248, ¶ 9, the Board clarified that "if an employee has a reasonable belief that the disclosed information evidences the kinds of misconduct listed in section 2302(b)(8), rather than a policy disagreement, [the disclosure] is protected." Here, the appellant did no more than disagree with Dr. Nichols's prescribing practices and amount to no more than part of a larger robust debate over how to manage the high cost of Hep C medications and medication alternatives. As the record reflects, the discussion about Hep C medications and their cost was a nationwide discussion; it was not unique to the MBVAMC. The appellant herself testified at her deposition that the VISN monitored the treatment and spending of Hep C so closely that "we didn't have to report it, [the VISN] knew it second by second every pill that was getting dispensed." *See* W2F, Exhibit 20 at T58; *see also* T58-59 (testifying that the VISN held weekly calls with all the facilities to address pending issues about treatment and the budget); T87 (stating that "every aspect" of patients' treatment was discussed in HIT meetings). The appellant has provided no evidence to support her assertion that her disagreement with Dr. Nichols's treatment plan or discussions about the Hep C budget was anything other than her disagreements, interjected into a much

larger on-going discussion of issues being discussed and addressed. Hence, her limited communications on this topic are not the type of communications protected by the WPEA.

Based on the foregoing, I find that the appellant has failed to make nonfrivolous allegations that she made any protected disclosures. Accordingly, I find that she has failed to establish that the Board has jurisdiction over her IRA appeal.

Because the appellant failed to meet the first prong of the jurisdictional standard, there is no need to issue a finding as to whether she nonfrivolously alleged that the agency took or failed to take a personnel action against her, although I note that the statute regards a demotion and reassignment or transfer as personnel actions. *See* 5 U.S.C. § 2302(a)(2)(A) (iv); *see also Carey v. Department of Veterans Affairs*, 93 M.S.P.R. 676, ¶¶ 3 and 9 (2003) (Reassignment to an equivalent position is a personnel action in an IRA). There is also no need to address issues the appellant raises that might go to whether the agency would have met its burden to prove by clear and convincing evidence that it would have declined to take the same personnel action in the absence of any protected disclosure. *See* 5 U.S.C. § 1221(e); *Scoggins v. Department of the Army*, 123 M.S.P.R. 592, ¶ 28 (2016); *see also Whitmore v. Department of Labor*, 680 F.3d 1353, 1367 (Fed. Cir. 2012).

## DECISION

The appeal is DISMISSED.

FOR THE BOARD: _____
Michael T. Rudisill
Administrative Judge

**NOTICE TO APPELLANT**

This initial decision will become final on **June 27, 2019**, unless a petition for review is filed by that date. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. If you are represented, the 30-day period begins to run upon either your receipt of the initial decision or its receipt by your representative, whichever comes first. You must establish the date on which you or your representative received it. The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

**BOARD REVIEW**

You may request Board review of this initial decision by filing a petition for review.

If the other party has already filed a timely petition for review, you may file a cross petition for review. Your petition or cross petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record. You must file it with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition or cross petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

## NOTICE OF LACK OF QUORUM

The Merit Systems Protection Board ordinarily is composed of three members, 5 U.S.C. § 1201, but currently there are no members in place. Because a majority vote of the Board is required to decide a case, *see* 5 C.F.R. § 1200.3(a), (e), the Board is unable to issue decisions on petitions for review filed with it at this time. *See* 5 U.S.C. § 1203. Thus, while parties may continue to file petitions for review during this period, no decisions will be issued until at least two members are appointed by the President and confirmed by the Senate. The lack of a quorum does not serve to extend the time limit for filing a petition or cross petition. Any party who files such a petition must comply with the time limits specified herein.

For alternative review options, please consult the section below titled "Notice of Appeal Rights," which sets forth other review options.

## Criteria for Granting a Petition or Cross Petition for Review

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition or cross petition for review. Situations in which the Board may grant a petition or cross petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific

evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), a petition for review, a cross petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words, whichever is less. A reply to a response to a petition for review is limited to 15 pages or 3750 words, whichever is less. Computer generated and typed pleadings must use no less than 12 point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. A request for leave to file a pleading that exceeds the limitations prescribed in this paragraph must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to

submit pleadings of the maximum length. Typically, a well-written petition for review is between 5 and 10 pages long.

If you file a petition or cross petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. A petition for review must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you or your representative more than 5 days after the date of issuance, 30 days after the date you or your representative actually received the initial decision, whichever was first. If you claim that you and your representative both received this decision more than 5 days after its issuance, you have the burden to prove to the Board the earlier date of receipt. You must also show that any delay in receiving the initial decision was not due to the deliberate evasion of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by fax or by electronic filing is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. *See* 5 C.F.R. § 1201.4(j). If the petition is filed electronically, the online process itself will serve the petition on other e-filers. *See* 5 C.F.R. § 1201.14(j)(1).

A cross petition for review must be filed within 25 days after the date of service of the petition for review.

### NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

## NOTICE OF APPEAL RIGHTS

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above.  5 U.S.C. § 7703(a)(1).  By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file.  5 U.S.C. § 7703(b).  Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction.  If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements.  Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case.  If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) <u>Judicial review in general</u>**.  As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be <u>received</u> by the court within **60 calendar days** of <u>the date this decision becomes final</u>.  5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) Judicial or EEOC review of cases involving a claim of discrimination**.  This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination.  If so, you may obtain judicial review of this decision—<u>including a disposition of your discrimination claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after this decision becomes final</u> under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. ____ , 137 S. Ct. 1975 (2017). If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security.  *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues.  5 U.S.C. § 7702(b)(1).  You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after this decision becomes final as explained above.  5 U.S.C. § 7702(b)(1).

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**.  This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and you wish to challenge the Board's rulings on your whistleblower claims only, excluding all other issues, then you may file a petition for judicial review with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.  The court of appeals must receive your petition for review within **60 days** of the date this decision becomes final under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

> U.S. Court of Appeals
> for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx

<u>**CERTIFICATE OF FILING AND SERVICE**</u>

I hereby certify that on this 18th day of October, 2019, I caused this Brief of

Petitioner to be filed electronically with the Clerk of the Court using the CM/ECF

System, which will send notice of such filing to the following registered CM/ECF

users:

Eric Laufgraben
U.S. Department of Justice
Commercial Litigation Branch
Post Office Box 480
Ben Franklin Station
Washington, DC 20044
(202) 261-2838
eric.e.laufgraben@usdoj.gov

Jeffrey Gauger
U.S. Merit Systems Protection Board
1615 M Street NW
Washington, DC  20419
(202) 254-4488
Jeffrey.Gauger@mspb.gov

*Counsel for Respondent*

*Counsel for Respondent*

/s/ Kellee Boulais Kruse
*Counsel for Petitioner*

# CERTIFICATE OF COMPLIANCE

1.  This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    [ X ] this brief contains [*5,049*] words.

    [    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.  This brief complies with the typeface and type style requirements because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2016*] in [*14pt Times New Roman*]; *or*

    [    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: <u>October 18, 2019</u>          <u>/s/ Kellee Boulais Kruse</u>
                                        *Counsel for Petitioner*